IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

BAPTIST HEALTH d/b/a/ BAPTIST MEMORIAL
MEDICAL CENTER - - NORTH LITTLE ROCK                                    PLAINTIFF

v.                          4:04CV01463-WRW

TOMMY G. THOMPSON, in his official capacity
as Secretary, U.S. Department of Heath and Human
Services                                                                 DEFENDANT

**ORDER**

Baptist Health appeals the decision of the Secretary of the United States Department of Health and Human Services ("HHS") regarding denial of Medicare reimbursement to a hospital for nursing and allied health education costs. The decision by the Secretary was rendered through the Administrator of the Centers for Medicare and Medicaid Services ("CMS"). CMS is a component of HHS that administers the Medicare program. Pending is Thompson's Motion for Summary Judgment (Doc. No. 16) and Baptist's Cross-Motion for Summary Judgment (Doc. No. 19). Although raised as cross-motions for summary judgment, this Court will treat the this case as an appeal from an administrative agency -- the standard of review is determined by the Administrative Procedure Act.[1]

---

[1] 5 U.S.C. § 701 *et seq*.

1

**I.     Introduction**

This action arises under title XVIII of the Social Security Act,[2] commonly referred to as the Medicare statute, which establishes a federally funded health insurance program for the elderly and disabled. Baptist has a Medicare provider agreement with the Secretary and furnishes health care services to Medicare beneficiaries. Part A of Medicare ("Hospital Insurance Benefits"), authorizes payment for covered hospital services and other institutional services. The Medicare program reimburses costs to provider hospitals through a "fiscal intermediary," normally an insurance company under contract to the Secretary; in this case, Blue Cross Blue Shield. The fiscal intermediary acts as a claims adjustor for the Secretary and determines how much of the hospital's claimed Medicare reimbursement costs should be paid.[3] The intermediary analyzes the claims made in the report, performs an audit, and eventually issues a written Notice of Program Reimbursement informing the provider hospital of the amount of reimbursement to which it is entitled.[4]

If the provider hospital is not satisfied with the intermediary's reimbursement determination, the hospital can, within 180 days of the Board's decision, request a hearing before the Provider Reimbursement Review Board (the "Board"),[5] which is within the HHS. The Board consists of five people within HHS that decide Medicare reimbursement disputes between hospitals and the

---

[2] 42 U.S.C. § 1395 *et seq*.

[3] 42 C.F.R. § 413.20(b); *see also Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 809 (D.C.Cir. 2001).

[4] 42 U.S.C. § 405.1803(a)(2).

[5] 42 U.S.C. § 1395oo(a)

Medicare program. The Board's decision is the final agency determination of the reimbursement claim unless the Secretary on his own motion decides to affirm, reverse, or modify the decision of the Board.[6] As will be discussed below, the Secretary's decision, which was rendered through the Administrator of CMS, reversed the Board's decision granting Baptist reimbursement for classroom costs.

This case involves four consolidated appeals,[7] originally brought by Memorial before the Board. The Board and Administrator addressed whether Baptist is entitled to "pass-through" reimbursement by Medicare for the "clinical" and "classroom" costs of providing nursing and allied health education. These four appeals involve Baptist's fiscal years ending 12/31/1991 through 12/31/1994. Because of an internal remand within HHS, there were two decisions by the Administrator, reviewing two decisions by the Board. Both Board decisions allowed all nursing and allied health education costs, both clinical and classroom, on a pass-through basis. Baptist presently seeks judicial review of the Administrator's decision to reverse the Board by limiting reimbursement to clinical costs only.

### a. Standard of Review

Under the APA, a court can set aside an agency action if the court finds the action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[8] Similarly, a Court should set aside any agency decision issued on the basis of an evidentiary hearing

---

[6] 42 U.S.C. § 1395oo(f)(1).

[7] The four consolidated Board case numbers are 95-2033, 96-1979, 97-1498, and 98-2049.

[8] 5 U.S.C. § 706(2)(A).

record if the agency decision is "unsupported by substantial evidence" in the record.[9] A court must give substantial deference to an agency's interpretation of its own regulations,[10] and that interpretation "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation'" itself.[11] Under this test, a court must defer to an agency's interpretation of a regulation unless an alternative reading is "compelled by the regulation's plain language" or, if the language is ambiguous, by "other indications of the Secretary's intent at the time of the regulation's promulgation."[12] If the language of a regulation does not "speak clearly 'to the precise question at issue'" in a case, "say[ing] nothing explicitly about" the specific matter in dispute, the court must give substantial deference to the agency's resolution of the resulting ambiguity.[13]

The court's task then is "not to decide which among several competing interpretations best serves the regulatory purpose;" rather, the court must set aside only those agency interpretations that are plainly "inconsistent" with the regulation itself.[14] The Supreme Court has recognized that this heightened deference is particularly warranted in the Medicare context because of the complex and highly technical nature of the program, where "the identification and classification of relevant

---

[9] 5 U.S.C. § 706(2)(E).

[10] *Milton Hosp. Transitional Care Unit v. Thompson*, 377 F. Supp. 2d 17, 24 (D.D.C. 2005).

[11] *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994).

[12] *Id.*

[13] *Barnhart v. Walton*, 535 U.S. 212, 217-19 (2002).

[14] *Thomas Jefferson*, 512 U.S. at 512.

'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'"[15]

### b.     History

In an effort to curtail escalating Medicare expenditures, Congress revised the reimbursement scheme in 1983.[16] Congress adopted the Prospective Payment System ("PPS"), which relies upon prospectively fixed rates for each category of treatment rendered.[17] Congress adopted PPS because it was more restrictive than the reasonable cost system. Under the PPS scheme, after a four-year transition period, Medicare began to pay hospitals for their inpatient operating costs on the basis of prospectively determined rates rather than on a reasonable cost basis.[18] These PPS rates are calculated according to hospital costs in a base year, 1981. Although Congress gave the Secretary discretion to determine a hospital's inpatient operating costs under PPS, Congress specifically excluded approved educational activities[19] from the PPS rates.[20]

Medicare payments for approved educational activities operated directly by the hospital were deemed to be costs that "pass-through" PPS and continue to be made on a reasonable cost basis.[21]

---

[15] *Thomas Jefferson*, 512 U.S. at 512.

[16] *Id.*

[17] 42 U.S.C. § 1395ww.

[18] 42 U.S.C. § 1395ww(d).

[19] 42 C.F.R. § 413.85(c) (2001) (By regulation, the Secretary has defined "approved educational activities" as "formally organized or planned programs of study usually engaged in by providers in order to enhance the quality of patient care.").

[20] 42 U.S.C. § 1395ww(a)(4) ("operating costs . . . do not include costs of approved educational activities . . .").

[21] 42 U.S.C. § 1395f(b).

All other costs of educational programs, such as the cost associated with programs operated by third parties, on-the-job training programs, employee education, continuing education, and maintaining and operating a medical library, are activities considered to be part of the normal operating costs covered by the hospital's PPS payment.[22]

Following the Congressional adoption of PPS in 1983, the Secretary issued new regulations.[23] The new regulations that implemented PPS prohibited pass-through treatment for "[c]linical training of students not enrolled in an approved education program operated by the provider" and "activities that do not involve the actual operation of an approved education program."[24] As early as 1984, the Secretary stated that "only the costs of those approved medical education programs operated directly by a hospital be excluded from [PPS]."[25] The Secretary continued in the preamble:

> If a program is operated by another institution, . . . [it] must be noted that by far the majority of the costs of that program are borne by that other institution, and not by the hospital. While it is true that the hospital may incur some costs associated with its provision of clinical training to students enrolled in a nearby institution, the hospital also gains in return. For example, it obtains the services of the trainee . . . We do not believe that this type of relationship was what Congress intended when it provided for a pass through of the costs of approved medical education programs. Rather, we believe that Congress was concerned with those programs that a hospital operates itself, and for which it incurs substantial direct costs . . . . We are revising 405.421(d)(6) [now 413.85(d)(6)] to clarify that the costs of clinical training for students enrolled in programs, other than at the hospital, are normal operating costs.[26]

---

[22] 49 Fed. Reg. 234, 267, and 295 (Jan. 3, 1984).

[23] *Community Care Foundation v. Thompson*, 318 F.3d 219, 222 (D.C. Cir. 2003).

[24] 42 C.F.R. § 413.85(d)(6), (7).

[25] 49 Fed. Reg. 234, 267 (Jan. 3, 1984)(preamble to rule).

[26] 49 Fed. Reg. 234, 267 (Jan. 3, 1984).

In 1989 and 1990, Congress passed the Omnibus Budget Reconciliation Act of 1989 ("OBRA 89")[27] and the Omnibus Budget Reconciliation Act of 1990 ("OBRA 90"),[28] which allows broader pass-through payment of nursing education costs where specific criteria are met. Section 6205 of OBRA 89,[29] created a temporary category of hospital-based nursing schools in addition to those already recognized under 42 C.F.R. § 413.85. It permitted reimbursement of a hospital's reasonable costs of training students in a hospital-based nursing school if:

> [B]efore June 15, 1989, and thereafter, the hospital demonstrates that for each year, it incurs at least 50 percent of the costs of training nursing students at such school, the nursing school and hospital share some common board members, and all instruction is provided at the hospital, or if in another building, a building on the immediate grounds of the hospital.[30]

In 1990, Congress extended OBRA 89 nursing education legislation by enacting Section 4004(b) of OBRA 90.[31] OBRA 90 allows reasonable cost reimbursement of the clinical training costs associated with nursing and allied health education programs not operated by a hospital upon certain conditions.[32]

---

[27] Pub. L. No. 101-239, 103 Stat. 2106 (1989).

[28] Pub. L. No. 101-50, 104 Stat. 1388 (1990).

[29] Pub. L. No. 101-239, 103 Stat. 2106 (1989).

[30] 42 U.S.C. § 1395x note (Recognition of Costs of Certain Hospital-Based Nursing Schools).

[31] Pub. L. No. 101-508, 104 Stat. 1388 (1990).

[32] 42 U.S.C. § 1395ww note (Payments for Medical Education Costs).

**III.    Argument**

Plaintiff is a provider of Medicare services and is owned by Baptist Medical Systems, Inc. ("BMS, Inc."). During 1993, the relevant cost year at issue in this appeal, BMS, Inc. owned several other hospitals and Baptist Medical System School of Nursing. Also in 1993, Baptist and the nursing school had a Memorandum of Agreement ("Agreement") that established the general activities in which Baptist would serve as a "clinical laboratory" for the School of Nursing. After reviewing the Agreement, the Administrator determined that it proved Baptist served as a "clinical site for the School of Nursing" and nothing else. Based on this finding, the Administrator found that only those nursing education costs associated with an education program operated directly by a hospital would be paid on a pass-through basis.

In 1983, when Congress enacted PPS, the costs of the School of Nursing were reflected on the home office cost statement of the parent corporation, BMS, Inc., with an allocation made to the various Baptist hospitals. At the time, all of BMS, Inc.'s institutions received an allocation of the costs of the school and received reimbursements on a pass-through basis. In 1990, the CMS Regional Office informed the fiscal intermediary that the "provider might have a problem; all of the nursing school and allied health costs might be non-allowable."[33] The letter informed the fiscal intermediary that because the hospitals were not directly operating the nursing schools, "it has been determined that none of the costs incurred by BMS qualifies for pass-through reimbursement on a reasonable cost basis."[34] In response to this determination, as of January 1, 1991, BMS placed the costs of the nursing school on Baptist's books (where they had historically been placed before the

---

[33]Doc. No. 17, p. 13.

[34]Doc. No. 17, p. 13.

requirement that BMS file a home office cost statement).  For 1991 and subsequent years, BMS attempted to make a further allocation from Baptist to various other hospitals; however, the intermediary reclassified these costs and, as a result, only Baptist has been reimbursed as an operator of the nursing school.

Baptist argues that the Administrator's final decision is contrary to law and unsupported by substantial evidence, and must be set aside.  It contends that Congress mandated that the cost of "approved educational activities," including costs of nursing education programs, be reimbursed on a pass-through basis.  Baptist also argues that any change in the payment policy could only be done after "notice and comment" rule making published in the Federal Register.  Baptist concludes by arguing that it is a direct operator of the nursing school.

The U.S. Court of Appeals for the District of Columbia Circuit recently addressed a similar fact situation, which involved Baptist Medical Systems and its School of Nursing.[35]  In *Community Care*, Baptist entered into an agreement with Northwest Medical Center, under which Baptist's School of Nursing would operate on Northwest's campus.  Baptist was responsible for both the direct costs of the nursing program and for paying salaries and expenses for the program.  Baptist also demonstrated that it was required to provide buildings, equipment, maintenance, and insurance for the program.  Baptist presented the above proof to show that there had been an accurate allocation of costs and that it was entitled to payment for those costs.  Baptist also argued that it was a provider of services under Medicare; therefore, the program should be considered jointly operated by both Baptist and Northwest.

---

[35]*Community Care*, 318 F.3d 219, 225.

The Court of Appeals rejected Baptist's argument, finding that the Administrator reasonably determined that Northwest should not be considered the direct operator of the nursing program under the Medicare PPS rules. Specifically, the court held that Northwest "merely contracted for a service to be furnished by BMS, the owner and operator of the nursing education program . . . BMS is a corporation which owns several facilities which, in turn, have provider agreements with the Medicare program."[36] The Administrator refused to use federal taxpayer money to support a program that already received sufficient support from other sources, especially where the provider receives some gain in return for its contributions of resources to the program.

I adopt the analysis of *Community Care* and find that any classroom costs that Baptist incurred by extending its facilities to its nursing school are not covered by Medicare strictly because there is no link to the care and treatment of its patients. Specifically, because there is no assurance that the nursing students will solely care for Medicare patients upon graduation, there in no incentive for Medicare to cover classroom costs. Furthermore, classroom costs should not be covered by Medicare because Baptist is already receiving reimbursement for those costs through tuition.

In OBRA '89 and '90, Congress recognized the Administrator's previous decision to limit pass-through payments to only those programs directly operated by a Medicare provider. Where an agency's interpretation of law has come to the attention of Congress and Congress has acted to alter the statute but left aspects of the Administrator's policies in effect, those policies should be viewed as consistent with congressional intent.[37] Upon review of the facts of this case, the Administrator concluded that Memorial was not the actual operator of the nursing school as contemplated in the

---

[36]*Community Care*, 318 F.3d at 225.

[37]*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982).

federal regulations and by Congress. The Administrator was not persuaded that either the organizational structure of BMS, Inc. or the Agreement between Baptist and the nursing school demonstrated the necessary participation for Baptist to be considered the direct operator of the School of Nursing.

In reaching his conclusion, the Administrator considered Baptist's argument that, although it was "doing-business-as" the School of Nursing, it was, in fact, the direct operator. Despite this argument, the Administrator found that the "School of Nursing, Baptist Medical Center and [Baptist] are under a common Board of Trustees does not mean that [Baptist] directly operated the nursing program."[38] During the cost year at issue in this appeal, 1993, Baptist and its School of Nursing had a Memorandum of Agreement that established the general activities planned for Memorial to serve as a "clinical laboratory" for the school. The Agreement established that the school's faculty would provide the "necessary instruction and supervision" for the students.[39] The Agreement outlined Baptist's responsibilities as "serving as a clinical laboratory in which nursing students may be assigned for education experiences."[40] Much like the plaintiff hospital in *Community Care*, the Agreement demonstrates that Baptist merely served as the clinical site for the School of Nursing.

The terms of the Agreement support the Administrator's finding that "the responsibilities associated with the operation of a nursing program reside with the School of Nursing, not Baptist" because Baptist was only required to "serve as a clinical laboratory in which nursing students may

---

[38] Doc. No. 1, Ex. A, p. 8.

[39] Doc. No. 17, p. 29.

[40] Doc. No. 17, p. 29.

be assigned for educational experiences."[41]  Moreover, I find it inconsequential that the fiscal intermediary reimburses BMS, Inc., not the nursing school, for Medicare costs associated with the nursing school.  Ownership of a nursing school alone is not enough to qualify Baptist as the "direct operator" of the school.  Therefore, because BMS, Inc. did not directly operate the nursing school and because Baptist has already been compensated for any clinical costs, payment of any other costs were denied -- to hold otherwise would allow Baptist to receive a windfall from its students' tuition payments.

In a final argument, Baptist contends that the application by the Administrator of a regulation that applies only to clinical and not classroom costs imposes a new and inappropriate "provider-operated" test for pass-through reimbursement of classroom costs.  Baptist suggest that the Administrator's decision requiring it to be the actual operator of the nursing school in order to receive pass-through payments constitutes a substantive rule that has not been promulgated in accordance with the notice and comment rule making procedures of the APA.

Defendant, on the other hand, argues that the direct operator policy was, in fact, established through notice and comment rule making as part of the 1984 PPS final rule.[42]  The Defendant next argues that even if notice and comment rule making were not used, Baptist's contention can be disposed of because the Administrator ruled on Baptist's claim through an adjudication. When an agency engages in rule making  -- defined as the agency "process for formulating, amending, or repealing a rule" -- and promulgates certain types of rules, it must do so pursuant to notice and

---

[41]Doc. No. 17, p.29.

[42]49 Fed. Reg. 267.

comment rule making procedures under the APA.[43]  However, these notice and comment rule making requirements do not apply when an agency acts by adjudication, which is defined as the "agency process for formulation of an order."[44]  The Supreme Court has explicitly endorsed the Administrator's authority to promulgate rules through both rule making and adjudication.[45]

Taking the heightened deference given to decisions concerning Medicare into account, I find that the Administrator's decision to limit reimbursement to clinical costs was supported by substantial evidence -- not the least of which was the decision of a sister court; and Congress's intent in promulgating OBRA '89 and '90.  Accordingly, Plaintiff's Motion for Summary Judgment is DENIED.  Defendant's Cross-Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED this 9th day of November, 2005.

/s/ Wm. R.Wilson,Jr.
UNITED STATES DISTRICT JUDGE

---

[43] 5 U.S.C. § 551(5), 553.

[44] 5 U.S.C. § 551(7); *see also Cheshire Hosp. v. New Hampshire-Vermont Hospitalization Serv. Inc.*, 689 F.2d 1112, 1122-23 (1st Cir. 1982).

[45] *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995) ("The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication.").